**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────

**UQUA BLAIR,** *an infant, by his[1] aunt*          **1:07-CV-88**
*and legal custodian and guardian,*          **(GLS/DRH)**
**LESLIE J. PAUL** *and* **LESLIE PAUL**
*individually***,**

                    **Plaintiffs,**

          **v.**

**STEVEN A. CULBERT, M.D., MICHAEL**
**D. CHRISTINE, M.D., DAVID M.**
**KIMBLE, M.D., ST. PETER'S**
**HOSPITAL OF THE CITY OF ALBANY**
*and* **THE UNITED STATES OF**
**AMERICA, WHITNEY M. YOUNG JR.**
**HEALTH CENTER INC.,**

                    **Defendants.**

─────────────────────────────

**APPEARANCES:**                    **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

Office of John Chambers, PC          STEVEN S. SIEGEL, ESQ.
60 East 42nd Street          JOHN T. CHAMBERS, ESQ.
Suite 3126
New York, NY 10165

**FOR DEFENDANTS:**

──────────────────

     [1]The caption of the complaint erroneously refers to Uqua Blair as a female.  The court
has *sua sponte* substituted the correct gender, and directs the Clerk to amend the docket
accordingly.

**Steven A. Culbert, M.D. and**
**St. Peter's Hospital**
Thorn, Gershon Law Firm            JEFFREY J. TYMANN, ESQ.
5 Wembley Court                    ERIN P. MEAD, ESQ.
P.O. Box 15054                     MANDY M. MCFARLAND, ESQ.
Albany, NY 12212

**Michael D. Christine, M.D.,**
**United States of America,**
**Whitney M. Young Jr. Health**
**Center, Inc.**
Hon. Andrew T. Baxter             DIANE CAGINO
U.S. Attorney, N.D.N.Y.           Assistant U.S. Attorney
445 Broadway
218 James T. Foley Courthouse
Albany, NY 12207-2924

**David M. Kimble, M.D.**
Carter, Conboy Law Firm            JEREMY P. CHEN, ESQ.
20 Corporate Woods Boulevard       LEAH W. CASEY, ESQ.
Albany, NY 12211

**Gary L. Sharpe**
**U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

### I.  Introduction

Infant Uqua Blair and his aunt and legal guardian Leslie Paul bring

this action alleging that medical malpractice by the defendants named

herein during Uqua's birth caused him serious and permanent brain

injuries.  (*See* Dkt. No. 1.)  Presently before the court is a motion for

2

summary judgment by the federal government on behalf of the United

States of America, Michael D. Christine, M.D., and the Whitney M. Young

Jr. Health Center, Inc. (collectively the "Government"). (*See* Dkt. No. 58.)

For the reasons that follow the Government's motion is denied.

## II. <u>Facts and Procedural History</u>[2]

Uqua was born to 17 year old Stephanie Blair on March 8, 2000, at

St. Peter's Hospital in Albany, New York. (*See* Gov. SMF ¶ 22; Dkt. No.

58.)  The delivery did not go smoothly.  Ms. Blair pushed for so long that

blood vessels in her eyes and face burst, and she was aware that every

time she pushed Uqua's oxygen level and heart rate dropped.  *Id*. at ¶¶ 14-

15.  She also observed that the medical staff in the room knew something

was wrong and sent for a physician.  *Id*. at ¶ 16.  The on-call doctor,

defendant Michael D. Christine M.D., responded and it was decided that

Uqua would be delivered by cesarean section.  *Id*. at ¶ 19.  Ms. Blair

testified that midwives continued to have her push when Doctor Christine

left to prepare for the surgery, which made him extremely angry and upset

---

[2]The facts are expressed in a light most favorable to the plaintiffs and are drawn from the parties respective 7.1 statements to the extent they are supported by the record and undisputed, or disputed without record cites.  *See* N.D.N.Y. R. 7.1(a)(3).  The court notes that the Government has not deemed it necessary to respond to the opposing parties' supplemental 7.1 statements.  As such, they are treated as being admitted.

when he returned.  *Id*. at ¶¶ 20-21.

At 5:24 a.m. Uqua was delivered via cesarean section in a state of critical illness, with complications including meconium aspiration,[3] probable sepsis[4] and persistent pulmonary hypertension.[5]  (*See* Gov. SMF ¶¶ 22-23; Dkt No. 58, Pl. Ex. A pp. 14-15; Dkt. No. 62.)  He was limp and apneic with a heart rate of 60 bpm.  (*See* Gov. SMF ¶ 24; Dkt No. 58.)  He also had an initial Apgar score of 2, which rose to 7 at five minutes after birth.[6]  *Id.* at ¶ 25.  Uqua was suctioned and ventilated with a 100% FiO2 bag mask.  *Id*. at ¶ 26.  At this point Uqua's heart rate increased to 100 bpm, but he remained apneic and required occasional hand bagging, as he was without spontaneous respiration.  *Id*. at ¶¶ 27, 28.  He was then brought to the neonatal intensive care unit.  *Id*. at ¶ 29.  Ms. Blair and her family were told that he required transfer to the Children's National Medical Center

---

[3]Meconium Aspiration Syndrome is "the respiratory complications resulting from the passage and aspiration of meconium [fetal fecal matter] prior to or during delivery."  *Dorland's Illustrated Medical Dictionary* 1634 (28th ed. 1994).

[4]Sepsis is "the presence in the blood or other tissues of pathogenic microorganisms or their toxins."  *Dorland's Illustrated Medical Dictionary* 1507 (28th ed. 1994).

[5]Pulmonary hypertension is high blood pressure within the pulmonary arterial circuit.  *Dorland's Illustrated Medical Dictionary* 801 (28th ed. 1994).

[6]An Apgar score is used to indicate the physical condition of a newborn infant.  It factors in heartbeat, respiration, muscle tone, reflexes, and color.  An Apgar score of 3 or less requires resuscitation.  *Dorland's Illustrated Medical Dictionary* 1497 (28th ed. 1994).

("CNMC") in Washington D.C., for possible ECMO[7] due to persistent pulmonary hypertension and severe respiratory insufficiency.  (*See* Gov. SMF ¶ 30; Dkt No. 58, Pl. SMF ¶ 46; Dkt. No. 62.)  However, upon arrival at CNMC Uqua was not given ECMO due to his improved condition.  (*See* Gov. SMF ¶ 30; Dkt No. 58, Pl. SMF ¶ 47; Dkt. No. 62.)  He was subsequently returned to St. Peters on March 13th and discharged to Ms. Blair on the 15th or 23rd in "excellent condition" with no neurological impairment noted.  (*See* Gov. SMF ¶ 31; Dkt No. 58, Pl. SMF ¶¶ 49-51; Dkt. No. 62.)

On May 6, 2000, Ms. Blair brought Uqua to the emergency room at Albany Medical Center for rotavirus caused dehydration and a mental status change.  (*See* Gov. SMF ¶ 35; Dkt No. 58, Pl. SMF ¶ 54; Dkt. No. 62.)  A series of medical scans were conducted on Uqua's head.  *Id*. at ¶¶ 36-38.  These reports noted, *inter alia*, that Uqua had a "hypoxic birth injury" and showed atrophy and hypodensity in the frontal lobes of Uqua's brain.  *Id*.  Ms. Blair requested a meeting to discuss these test results, though it is unclear from the record whether this meeting ever occurred.  *Id*.

---

[7]ECMO, short for extracorporeal membrane oxygenation, is a procedure whereby an infant suffering from respiratory insufficiency due to a lung disorder or underdevelopment is oxygenated by passing the infant's blood through an artificial lung.  THE MERCK MANUAL, 2136-37 (Mark H. Beers, M.D. & Robert Berkow, M.D. eds., 17th ed. 1999).

at ¶ 39.

After Uqua's May hospitalization, Ms. Blair took him to see some specialists because she knew something was wrong with him, but didn't know what it was.  (*See* Gov. SMF ¶ 40; Dkt No. 58, Pl. SMF ¶ 60; Dkt. No. 62.)  Subsequent visits to Uqua's pediatrician noted normal development, although a skull series was ordered to rule out craniosynostosis.[8]  (*See* Pl. SMF ¶¶ 55-56; Dkt. No. 62.)  While the films returned normal, Uqua was nevertheless referred to neurosurgeon John Waldman, M.D. for evaluation. *Id*. at ¶¶ 56, 57. On September 26, 2000, Doctor Waldman reviewed the May CT and MRI results and diagnosed Uqua with significant bifrontal brain injury presumably secondary to anoxia.  (*See* Gov. SMF ¶ 44; Dkt No. 58, Pl. SMF ¶ 57; Dkt. No. 62.)  The parties dispute whether this diagnosis was discussed with Uqua's family.  (*Compare* Waldman Dec.; Dkt. No. 65, *with*, Pl. SMF ¶¶ 58-61, 70-77; Dkt. No. 62, Pl. Exs. I and J; Dkt. No. 62.)  Doctor Waldman did not believe neurosurgical treatment was necessary, but recommended a developmental assessment and follow up.  (Pl. SMF ¶ 57; Dkt. No. 62.)  Uqua's subsequent medical records from 2000 and 2001

---

[8]Craniosyntosis is the "premature closure of the sutures of the skull." *Dorland's Illustrated Medical Dictionary* 390 (28th ed. 1994).

note his brain injury, though they are ambiguous as to the source relaying this information.  (*See* Pl. SMF ¶¶ 64, 65, 67; Dkt. No. 62, Pl. Ex. D at 59-61, 69-70, 95; Dkt. No. 62.)

In August of 2002 Uqua's aunt, plaintiff Leslie Paul, was granted custody of Uqua.  (*See* Pl. SMF ¶ 68; Dkt. No. 62.)  Paul was aware of the difficult circumstances of Uqua's birth, that he had been transferred to CNMC due to respiratory difficulties, and that he was being seen by various developmental specialists in the first six months of his life.  (*See* Gov. SMF ¶¶ 32, 45; Dkt No. 58.)  In April or May of 2003, Paul was advised by a doctor that Uqua had cerebral palsy.  (*See* Pl. SMF ¶¶ 72-74; Dkt. No. 62.)  Paul spoke with a lawyer for the first time on May 22, 2003, when she was first informed that Uqua's problems were probably related to his birth.  *Id*. ¶¶ at 71, 74, 77.

On April 15, 2004, plaintiffs commenced a medical malpractice action against defendants Steven A. Culbert, M.D.; Michael D. Christine, M.D.; David M. Kimble, M.D. and St. Peter's Hospital in New York State Supreme Court, Albany County, alleging negligence during the delivery of Uqua. (*See* Gov. SMF ¶ 1; Dkt No. 58.)  After the complaint was filed it was discovered that Doctor Christine was not an employee of St. Peter's, but

rather of the Whitney Young Jr. Health Center- a deemed healthcare facility pursuant to the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(g)-(n).  *Id.* at ¶ 3.  As such, a claim against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, is the exclusive remedy for Doctor Christine's alleged malpractice.

On becoming aware of Doctor Christine's federal status, plaintiffs filed administrative claims with the Department of Health and Human Services on January 12, 2005.  *Id.* at ¶ 6.  On January 13, 2005, the Government removed the state action to this court.  *Id.* at ¶ 3.  The United States was then substituted for Doctor Christine, and the claims against it were dismissed without prejudice on May 19, 2005 for failure to exhaust administrative remedies under 28 U.S.C. § 2675.  *Id.* at ¶¶ 4,5.  The remainder of the action was remanded to state court.  *Id.* at ¶ 5.

Plaintiffs' administrative claims failed to reach a final conclusion within six months, and they filed the instant action on January 23, 2007 pursuant to 28 U.S.C. § 2675.  (*See* Dkt. No. 1.)  On June 19, 2007, the Government moved for judgment on the pleadings or, in the alternative, summary judgment, on grounds that plaintiffs' action is time barred by the FTCA's two year statute of limitations.  (*See* Dkt. No. 25.)  The court

denied the motion with leave to renew after discovery.  (*See* Dkt. No. 43.)

Discovery has now been completed, and the Government's renewed

motion for summary judgment is pending.

### III.  Standard of Review

The standard for the grant of summary judgment is well-established,

and will not be repeated here.  For a full discussion of the standard, the

court refers the parties to its previous opinion in *Bain v. Town of Argyle,*

499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).

### IV.  Discussion

"It is well established that [t]he United States , as sovereign, is

immune from suit save as it consents to be sued, and hence may be sued

only to the extent that it has waived sovereign immunity by enacting a

statute consenting to suit."  *Millares Guiraldes de Tineo v. United States*,

137 F.3d 715, 719 (2d Cir. 1998) (internal quotation marks and citation

omitted).  The FTCA provides one such waiver, allowing tort suits against

the federal government "under circumstances where the United States, if a

private person, would be liable to the claimant in accordance with the law

of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

In order for a claim to be viable under the FTCA a plaintiff must

9

strictly comply with several statutory prerequisites, without which the court lacks subject matter jurisdiction.  *See Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999).  One such requirement is that a tort claim against the United States must be presented to the appropriate federal agency - in this case the U.S. Department of Health and Human Services - within two years after the claim accrues.  *See* 28 U.S.C. § 2401(b).  The Westfall Act provides a narrow exception to this requirement where, as in this case, the action is removed from state court, "the United States is substituted as the party defendant," and the case is dismissed for failure to comply with the FTCA's administrative claim requirement.  28 U.S.C. § 2679(d)(5).  Under such circumstances, a claim will be considered timely if it "would have been timely had it been filed on the date the underlying civil action was commenced" and "the claim is presented to the appropriate Federal agency within 60 days after dismissal of the civil action."  28 U.S.C. § 2679(d)(5)(B); *see also Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 83-84 (2d Cir. 2005).

In the present instance, plaintiffs filed their underlying action in New York State Supreme Court, Albany County, on April 15, 2004.  Thus, this action is timely if plaintiffs' claims against the Government accrued no more

than two years prior to that date.[9]  The Government contends that plaintiffs'

claims arose either on March 8, 2000, when Uqua was born, or by

September 26, 2000, when Doctor John B. Waldman diagnosed Uqua with

brain injuries, and are thus time barred.  (*See* Gov. Mem. at 16-18; Dkt. No.

58.)  Plaintiffs contrarily contend that their claims are timely because they

accrued in May of 2003 when plaintiffs first spoke to a lawyer and learned

that Uqua's injuries were permanent.  (*See* Pl. Mem at 8-11; Dkt. No. 62,

*see also* St. Peters Mem; Dkt. No. 60, Kimble Mem; Dkt. No. 61.)

Generally, "[a] claim under the [FTCA] accrues on the date that a

plaintiff discovers that he has been injured."  *Valdez v. United States*, 518

F.3d 173, 177 (2d Cir. 2008).  However, the emerging rule in the medical

malpractice context is that accrual of the statute of limitations is "postponed

until the plaintiff has or with reasonable diligence should have discovered

the critical facts of both his injury and its [iatrogenic] cause."  *Kronisch v.*

*United States*, 150 F.3d 112, 121 (2d Cir. 1998); *see also Valdez*, 518 F.3d

at 177-78 (quoting *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985)

(Posner, J.)).  A "claim does not accrue when a person has a mere hunch,

---

[9]Plaintiffs filed their administrative claims on January 12, 2005- one day before the Government removed the state action, and well within the 60 days provided by the Westfall Act for the filing of an administrative claim after a failure to exhaust dismissal.  *See* 28 U.S.C. § 2679(d)(5)(B).

hint, suspicion, or rumor of a claim." *Kronisch*, 150 F.3d at 121.

Nonetheless, "a plaintiff's suspicions may 'give rise to a duty to inquire

in[to] the possible existence of a claim in the exercise of due diligence.'"

*Valdez*, 518 F.3d at 178 (quoting *Kronisch*, 150 F.3d at 121).  Further, the

statute of limitations does not await knowledge of malpractice.  As the

Supreme Court has indicated "[t]here are others who can tell [the plaintiff] if

he has been wronged" once he is "in possession of the critical facts that he

has been hurt and who has inflicted the injury."  *United States v. Kubrick*,

444 U.S. 111, 122 (1979).

Here, plaintiffs' claims clearly did not accrue when Uqua was born,

contrary to the Government's contention.  The evidence cited in support of

this accrual date establishes no more than that Ms. Blair had a difficult

labor, and that she and her family were aware that Uqua was suffering from

critical respiratory distress as a result of meconium aspiration.  (*See* Gov.

Ex. 1 at 46, 66, 73-77, 79, 81-82, 171, 179, 183, 201, 203-05; Dkt. No. 58,

Gov Ex. 2 at 62; Dkt. No. 58, Gov. Ex. 3 at 106-07; Dkt. No. 58, Gov. Ex. 5;

Dkt. No. 58, Gov. Ex. 10; Dkt. No. 58.)  There is no indication plaintiffs

knew or should have known at the time that Uqua suffered brain damage

as a result, or that such injury was attributable to the manner of his

12

delivery.[10]  *See Valdez,* 518 F.3d at 178-79 (holding that claim did not

accrue during the three months following birth despite plaintiff's knowledge

that she had given birth to brain damaged baby, as plaintiff was not aware

of doctor-related cause of injury); *Lee v. United States*, 485 F. Supp. 883,

887 (E.D.N.Y. 1980) (claim did not accrue when plaintiff was aware of brain

injury caused by respiratory distress, but rather when plaintiff "knew or in

the exercise of due diligence should reasonably have known that the

alleged acts of the hospital doctors brought about that condition").  Indeed,

hospital records issued contemporaneously with Uqua's birth were quite

positive in their neurological assessments.  (*See* Pl. Ex. C at 11-13, 15;

Dkt. No. 62.)  As such, this case is distinguishable from the Eighth Circuit

case of *Ingram v. United States*, 443 F.3d 956, 962 (8th Cir. 2006), where

the plaintiffs had been informed of the baby's brain damage from

respiratory distress almost immediately following the child's birth and hired

an attorney shortly thereafter.

---

[10]The court is aware that some decisions have held that the limitations period begins to run when the injury is known even if the full extent of the damage is unknown or unpredictable. *See Robbins v. United States*, 624 F.2d 971, 973 (10th Cir. 1980).  However, a distinction must be made where, as here, only the medical complications which caused the injury were known, with the actual injury remaining latent until a later time.  *See Burgess v. United States*, 744 F.2d 771, 774-75 (11th Cir. 1984) (claim did not accrue when parents were aware baby had broken clavicle during birth, but rather when it was discovered that this resulted in Erb's Palsy). A rule to the contrary would require a plaintiff to sue for every possible injury which could arise from a complicated birth before any injury is actually apparent.

Whether plaintiffs' claims accrued in or around September of 2000, when Doctor Waldman issued his report, is a closer question.  Both Ms. Blair and Ms. Paul testified that they were aware that Uqua was being seen by various developmental specialists and therapists in his infancy.  (*See* Gov Ex. 2 at 99, 103; Dkt. No. 58, Gov. Ex. 3 at 112-16; Dkt. No. 58.) Further, Doctor Waldman's report clearly indicated his belief that Uqua had "sustained a significant bifrontal injury presumably secondary to anoxia," based upon his review of Uqua's May 2000 CT, EEG and MRI scans.  (*See* Gov. Ex. 11; Dkt. No. 58.)  Albany Medical Center records also indicate Ms. Blair requested a meeting to discuss the results of these scans.  (*See* Gov. Ex. 6, 5/6/00-5/10/00; Dkt. No. 58.)

Despite this evidence, the court is unable to find as a matter of law that plaintiffs' claims accrued in September of 2000.  As plaintiffs point out the record provides virtually no indication that medical personnel actually informed them that Uqua's developmental delays were the result of a brain injury, or that this injury was caused by the manner of Uqua's delivery.  The Government has attempted to remedy this deficiency by submitting an affidavit from Doctor Waldman in which he avers that he discussed Uqua's brain injury with Ms. Blair in September of 2000 and told her that such

injuries resulted from delivery.  (*See* Waldman Dec.; Dkt. No. 65.)

However, the court declines to consider this affidavit as it was improperly

submitted for the first time in the Government's reply brief.  *See, e.g.,*

*Wolters Kluwer Fin. Serv. Inc. v. Scivantage*, No. 07 CV 2352(HB), 2007

WL 1098714, at *1 (S.D.N.Y. 2007).  Additionally, the Waldman affidavit

goes no further than to create an issue of fact, as both Paul and Ms. Blair

have submitted affidavits swearing that no health care provider ever told

them that Uqua was injured during child birth or the cause of his mental

problems.  (Pl. Exs. I and J; Dkt. No. 62.)  This is consistent with

subsequent medical records from 2000 and 2001 in which Ms. Blair related

Uqua's past problems as meconium aspiration, a rotavirus infection,

craniosyntosis, and a soft spot on the baby's head, but seemingly made no

mention of brain damage.[11]  (*See* Pl. Ex. D at 59-61, 69-70, 95; Dkt. No.

62.)

    In sum, the court is unable to say as a matter of law that plaintiffs'

claims accrued by September of 2000, as the Government contends.

Indeed, despite plaintiffs' diligent attempts to discern the genesis of Uqua's

─────────────────────────

[11]While these records do note Uqua's brain injury, the source of this information and whether it was communicated to the plaintiffs is unclear.  (*See* Pl. Ex. D at 59-61, 69-70, 95; Dkt. No. 62.)

developmental delays, the record is ambiguous as to whether plaintiffs

knew of his brain injury and its iatrogenic cause by April of 2002.  Under

such circumstances, numerous courts have declined to find FTCA

malpractice claims time barred, even where it is known within two years of

delivery that the infant suffered an injury at birth.  *See, e.g., Nemmers v.*

*United States*, 870 F.2d 426 (7th Cir. 1989) (affirming district court holding

that claim did not accrue when plaintiff was informed that trauma of delivery

may have been one of many conditions which contributed to brain

damage); *Eramo v. United States*, 92 F. Supp. 2d 1290 (M.D. Fla. 2000);

*Lee*, 485 F. Supp. at 883.  If it is true that medical professionals never told

plaintiffs that Uqua suffered brain injury at birth - as Paul and Ms. Blair

contend - they would have had no reason to suspect a potential

relationship between his developmental delays and his delivery, and their

claim would be timely.  However, if the fact-finder determines that Uqua's

brain injury and its doctor related cause were communicated to plaintiffs by

April of 2002 - as Doctor Waldman will undoubtedly testify - their claims

against the Government will be time barred.  As such, the timeliness of

plaintiffs' claims hinges on the fact-finder's witness credibility assessments

and resolution of disputed facts.  Thus, the Government's motion for

16

summary judgment is denied.

As the timeliness of this action remains in question, the court declines to address the issue of equitable tolling. If the fact-finder ultimately determines that plaintiffs knew or should have known of Uqua's injury and its iatrogenic cause prior to April of 2002, the court will address the propriety of such a toll.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the Clerk shall amend the docket to properly reflect Uqua Blair's gender as provided in this opinion's caption; and it is further

**ORDERED** that the Government's motion for summary judgment (Dkt. No. 58) is denied; and it is further

**ORDERED** that the Clerk of the Court provide a copy of this Order to the parties by regular mail.

**IT IS SO ORDERED.**

Dated: May 7, 2009

United States District Court Judge

17